1               UNITED STATES DISTRICT COURT

2                DISTRICT OF PUERTO RICO

3

UNITED STATES OF AMERICA,

4
              Plaintiff,

5    v.                    Docket No. 17-161

6                    San Juan, Puerto Rico
    JAMES FRANCIS GORMAN,      October 31, 2018

7
              Defendant.

8    _____

9                REVOCATION HEARING

10      BEFORE THE HONORABLE JUDGE AIDA M. DELGADO COLON,

11            UNITED STATES DISTRICT JUDGE.

12    _____

13    APPEARANCES:

14    For the Government:    Ms. Elba Gorbea Padro, AUSA

15

16    For the Defendant:    Mr. Jesus Hernandez Garcia, AFPD

17

18

19

20

21

22

23

24
    Proceedings recorded by stenography.  Transcript produced by
25    CAT.

```
 1                        I N D E X

 2   WITNESSES:                                    PAGE

 3        None offered.

 4

 5   EXHIBITS:

 6        None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              San Juan, Puerto Rico

2              October 31, 2018

3              At or about 1:54 PM

4                      *     *     *

5          COURTROOM DEPUTY:  Criminal case 17-161, *United*

6   *States of America versus James Francis Gorman*.  Case called

7   for revocation of supervised release.  Appearing on behalf of

8   the United States, Assistant U.S. Attorney Elba Gorbea.

9   Appearing on behalf of the defendant, Assistant Federal Public

10  Defender Jesus Hernandez.

11          The defendant is present in court and will not

12  require the services of the court interpreter.

13          MS. GORBEA PADRO:  Good afternoon, Your Honor.  AUSA

14  Gorbea on behalf of the United States.  The government is

15  ready to proceed.

16          MR. HERNANDEZ GARCIA:  Good afternoon, Your Honor.

17  Jesus Hernandez on behalf of Mr. James Gorman.  We're also

18  ready to proceed.

19          THE COURT:  Okay.  So we are here for a final

20  revocation in essence.  There are several motions in the case

21  filed at docket 55, in June of 2018.

22          Technically, the probation officer reported that on

23  June the 1st of 2018, the defendant had to relocate from his

24  residence allegedly due to fear of being attacked by a former

25  employee.  He did so against the advice -- in essence, that he

1  reported via e-mail he was on the move and unable to stay in

2  one place, but he failed to report the address he was staying.

3  And the probation officer reports this to -- the violation of

4  the conditions of release, and also a SORNA violation of

5  course because of the registration requirement.

6          Then on June the 1st of 2018, he was scheduled to

7  report to the office no later than 5:30 PM.  He failed to

8  report.

9          There's a subsequent notification filed by the

10  probation officer, and it's at docket 61.  In essence, there's

11  information, of course, that on June 12 of 2018, he was

12  instructed to report to the Probation Office the following

13  day.  And he was instructed to provide the address where he

14  was staying, but he declined to do it.  And failed to report

15  in violation of his conditions of supervised release that on

16  12-24-2014, the defendant was arrested in New York by the

17  Marshal Service.

18          According to the report, at the time of arrest, he

19  was in possession of a Social Security card under the name of

20  Rolando Diaz Rodriguez, and had an ID with his picture with

21  the name Yimmie Perez Diaz on it.

22          It's my understanding that no charges have been filed

23  for those -- for that factual scenario, reason for which we

24  are talking technical violations, of course with the failure

25  to register being included.

1        There was a preliminary revocation hearing.  Probable

2   cause was determined as to all allegations of the probation

3   officer.  And it remains to be mentioned that the probation

4   officer was extensively questioned at the hearing in which he

5   testified.

6        So what is the position of this defendant at this

7   juncture?

8        MR. HERNANDEZ GARCIA:  Your Honor, on behalf of

9   Mr. Gorman, at this juncture, Your Honor, we will not be

10  challenging the allegations in the motion.  We will be arguing

11  for mitigation.

12       THE COURT:  Go ahead.

13       MR. HERNANDEZ GARCIA:  Your Honor, a review of the

14  PSR in this case will tell you what kind of person Mr. Gorman

15  is.  I think we have to understand who he is and his

16  background to give context to his conduct in this case.

17       His conduct in this case, there's no controversy that

18  he fled Puerto Rico because of death threats, Your Honor.

19  These death threats were communicated to the Probation Office,

20  and I believe the Probation Office corroborated Mr. Gorman's

21  version with his girlfriend, and also a police report that was

22  filed.

23       So his fleeing from the country was because of

24  credible death threats.  Yes, it's a violation, Your Honor,

25  but that's the context of his leaving the island.

1            Now, Mr. Gorman, Your Honor, when I reviewed the PSR,

2     I noticed his upbringing.  He hasn't had great parents.  He

3     moved around foster care.  His grandparents turned him over to

4     foster care when he was 15.  He's moved around to different

5     states growing up.  He's been hospitalized because of mental

6     illness, Your Honor, which includes bipolar disorder, PTSD,

7     hyperactivity, major depression.  And although some of these

8     conditions do not exist currently, when you speak to

9     Mr. Gorman, he does still battle some of these issues on a

10    daily basis.

11           He's very functional.  He does work.  He was a

12    fisherman most of his adult life, Your Honor.  But he was also

13    homeless a lot of periods of his life, Your Honor.  In fact,

14    when he was -- in the PSR, page two, his address was homeless.

15    And when he was arrested in New York in July of this year, he

16    was actually arrested at a homeless shelter in New York.  And

17    that's because he doesn't have a family base to lean on, Your

18    Honor.

19           He doesn't have any contact with his family members.

20    And why would he?  You know, these are members who abandoned

21    him when he was growing up.

22           However, we have identified one gentleman in New York

23    City who is a lifelong friend, who is willing to provide his

24    residence as a permanent address where Mr. Gorman can live or

25    reside.  And I think that's a big issue in this case, Your

1    Honor, because once Mr. Gorman is released, he has to go

2    somewhere.  He has to live somewhere.

3         Our solution would be to allow him to transfer to New

4    York City, because in Puerto Rico, he has no family members.

5    He's not from here.  He grew up in the United States.  He came

6    down here in 2016 to work with FEMA, but there is no real

7    connection to the island.

8         Excuse me, Your Honor.  He came -- correction, Your

9    Honor.  He came down here as a fisherman in 2016.  But there

10   is no -- there is no --

11        THE COURT:  So he came in 2016 as a fisherman or to

12   work with FEMA?

13        MR. HERNANDEZ GARCIA:  As a fisherman, Your Honor, in

14   2016.  And so he stayed.  But there's no real connection to

15   the island, Your Honor.  If he was released today, he would

16   have nowhere to go.  He would be homeless again.  There are no

17   family members to lean on in the States except this friend

18   that we have identified.

19        Actually, we've given the name of the person, the

20   address and the phone number to the probation officer.  We

21   gave the information to him a couple months ago so he could

22   corroborate the information we gave him.

23        The revocation proceeding has to be resolved in order

24   to -- the proceedings in this case.  He notified --

25        THE COURT:  I'm sorry.

1          MR. HERNANDEZ GARCIA:  He fled because he was under

2     death threats, and this was communicated to his probation

3     officer at the time via e-mail, Your Honor.

4          THE COURT:  And the probation officer gave him

5     instructions what to do and how to report, and he failed to

6     comply.

7          MR. HERNANDEZ GARCIA:  That's true, Your Honor.  But

8     in the context of credible death threats in Puerto Rico, Your

9     Honor --

10          THE COURT:  Who was threatening him?

11          MR. HERNANDEZ GARCIA:  Our information is an

12     ex-associate.

13          THE COURT:  Two employees that he had that he never

14     paid salaries, if at all?  If those were threats, maybe they

15     were trying to claim their monies because the defendant never

16     paid them -- and I'm not justifying the actions of these

17     individuals, but what he calls threats could be collection

18     actions by these individuals, not threats being made because

19     your client -- as far as I know, from the probation officer,

20     also received the help of another woman who worked in FEMA in

21     California, and then he began using her and demanding money

22     from her.

23          MR. HERNANDEZ GARCIA:  Your Honor, during his

24     allocution, he's going to explain in detail.  All I have is

25     the information I read in the e-mail.  But the concerns that

1  the Court has --

2          THE COURT:  I can understand that.  And right now

3  your client is technically talking to you and telling you

4  arguments and things to rephrase or to do.  I don't know what

5  instructions he's giving you, but in essence the information

6  that I received from the probation officer talks about an

7  individual that keeps manipulating those that even out of good

8  will, this woman, having approached him and tried to help him.

9  So this is a very different scenario.

10         And I'd rather have someone here that comes and tells

11 me the truth than having someone who tries to manipulate the

12 Court.  And this is what I see from this defendant.

13         MR. HERNANDEZ GARCIA:  One moment, Your Honor.  Yes,

14 Your Honor.

15         THE COURT:  Give me two seconds.

16         (Discussion held off the record with the probation

17 officer and the Court.)

18         THE COURT:  I'll hear from you, Counsel.

19         MR. HERNANDEZ GARCIA:  Yes, Your Honor.  In terms of

20 the interpretation of what happened, I can only inform the

21 Court what has been told to me of course, Your Honor.  There

22 was communication, however, and that's an important factor.

23 Whether he followed the instructions, I think we're not

24 challenging that violation, Your Honor.

25         And I know there was communication after he left the

1   island.  He was brought back in late July, Your Honor.  He's

2   been detained since.  And I just want to discuss the life he's

3   been living behind bars so far at MDC, Your Honor.

4           There has been some issues with the food he's

5   receiving.  My client is Jewish, Your Honor.  He does require

6   a kosher meal.  That wasn't being complied with.  In fact,

7   there were times he was given expired food.  There were some

8   instances where my client failed to eat as discrimination

9   because of his religion.  And we brought these issues to the

10  attention of the legal department at MDC.  He made strides to

11  better his conditions there, but that's the way he's been

12  living these past months at MDC, Your Honor.

13          So when you look at his background, Your Honor, which

14  is in the PSR, that's a fact.  And his conduct here, I think

15  if a plan -- I'm not asking the Court to treat him

16  preferentially, Your Honor, but you have to understand

17  sometimes his conduct is a reaction based on his mental

18  conditions, Your Honor.

19          However, I've spoken to Mr. Gorman since he's been in

20  Puerto Rico.  He does want to make a commitment to follow the

21  conditions of supervision, Your Honor.  His main concern, his

22  main and his principal concern is to relocate to the United

23  States, to the mainland, Your Honor, to serve his supervision

24  over there and to continue fishing, because that's his main

25  source of income, Your Honor.

1          Given the sort of facts, Your Honor, given his

2    background, Your Honor, I think it's time -- for the

3    violations he's committed, no -- incarceration would do no

4    good for him, Your Honor.  Our request would be to consider a

5    sentence of time served, Your Honor.  Consider moving him into

6    the halfway house in Puerto Rico until a transfer or

7    relocation can be done to the mainland, Your Honor.  And that

8    would be our request, Your Honor.

9          THE COURT:  Okay.  There was a time after the

10   defendant relocated in which he remained absconded until

11   arrested in New York or found in New York.

12         Can the probation officer state, for purposes of the

13   record, the information that you have gathered concerning

14   whether this defendant ever filed a complaint for those

15   threats that he alleges to have received and what is the

16   information that you have been able to receive?

17         PROBATION OFFICER:  Guillermo Arbona for the record.

18         The information that we have received is that

19   personally Mr. Gorman did not file any complaints.  However,

20   we do know that his consensual partner, Ms. Maria Samoa, she

21   filed a complaint, because allegedly two of the individuals

22   that were threatening Mr. Gorman tried to ask for some money

23   from her.  And she decided to file the complaint.

24         But Mr. Gorman, he was in Puerto Rico.  He did not

25   report to the police or make any complaints regarding the

1    allegations, Your Honor.

2            THE COURT:   Okay.   Any evidence indicating that the

3    threats against this defendant were real?

4            PROBATION OFFICER:   Your Honor, we spoke with the two

5    individuals that allegedly tried to engage in violent conduct

6    against Mr. Gorman, and both of them give us different

7    versions of the situation.   They say that Mr. Gorman was

8    supposed to pay them money for the job they did working for

9    him.   That he was subcontracted by FEMA, but he failed to pay

10   them.   And they were trying to receive the money that they

11   earned working for him.

12           And both assured not making any death threats against

13   Mr. Gorman.

14           THE COURT:   Okay.   And the information about this

15   woman who tried to help him and was the reason why he secured

16   the job with FEMA, and that later on the defendant was

17   attempting to get monies from her?

18           PROBATION OFFICER:   Yes.   Initially she was willing

19   to help Mr. Gorman, and she was doing so in addition to

20   helping him get the job with FEMA.   And -- but later she

21   understood that Mr. Gorman was taking advantage of her by

22   constantly asking for money from her, and it got to a point

23   that she thought that Mr. Gorman was doing so to take

24   advantage of her.

25           And she stopped sending him money because he was

1  making also promises that he was going to report to Puerto

2  Rico, that he was going to surrender, and that he was going to

3  face the authorities, and asking money from her to pay for the

4  air ticket.  But he failed to comply and use the money for the

5  things that he was promising her, so she stopped communicating

6  with Mr. Gorman and she stopped sending him money.

7          THE COURT:  Very well.  Thank you.

8          PROBATION OFFICER:  You're welcome.

9          THE COURT:  So addressing myself to the defendant.

10 Sir, there's information on the record.  Probable cause has

11 been determined, and no other evidence to the contrary has

12 been presented to the effect that you have violated the

13 conditions of supervised release as alleged by the probation

14 officer.

15          So is there anything you'd like to state and that I

16 should consider before sentencing you?

17          THE DEFENDANT:  Yes.  Good afternoon, Your Honor.

18          THE COURT:  Good afternoon.

19          THE DEFENDANT:  The two individuals that were working

20 for me -- I started with HUD.  And I got asked to move over to

21 a program called Tu Hogar Renace.  My position with HUD was to

22 do inspections on foreclosed properties by the Federal

23 Government.

24          In the first few months -- if you can remember, at

25 the beginning of the year, there were a lot of alleged

1  misconducts by a couple companies, of people going to houses,

2  doing shabby work.  My function with the company, the

3  subcontracting company for FEMA, Patriot, was to go to the

4  homes, inspect the homes, and to decide if the people should

5  get paid for it.

6          Now, I have two of my own employees:  One, Adrian

7  Torres, and the other Shawn something.  I don't remember at

8  this time, Your Honor.  I apologize.  They went to a house in

9  Ciales, Puerto Rico.  They replaced the window, and then they

10  took the window back down, took it back to Home Depot and

11  turned the receipt in to Patriot.

12          And this was brought to my attention, so I went

13  through all their receipts going back months.  And in the

14  process of going back, I discovered what they were doing is

15  they would go to a home, they would do what they call a

16  reorder, because anything by the government that was changed

17  that was not by FEMA or Tu Hogar Renace, you have to do a

18  reorder so the government can reimburse the company.  They

19  would do a reorder, pay out of pocket, take the stuff down,

20  put the old stuff back up, and tell them they didn't qualify

21  for it and take it back to Home Depot.

22          And it wasn't a lot of money.  We're talking 40

23  dollars here, 20 dollars there.  If you go to the place, I'm

24  sure you're familiar with the island, Ciales, it's a hike and

25  there's nothing up there.  So they've been instructed to

1    install three smoke detectors, and they only have two that

2    day.  They go to the store, buy one, get an itemized receipt

3    saying they bought this.  Well, they're turning in receipts

4    for universal remote controls.  Everybody that I work under

5    there, everybody's from the United States.  They don't speak

6    Spanish.  They don't know anybody.  My Spanish is getting

7    better, and I go to these places.

8             I went to a spot in Bayamon across from Adrian

9    Torres' house, where it says that he bought a universal

10   remote.  No.  It's just because they didn't have it written

11   down right.  Well, I went in there and there is no remote

12   anywhere.  I made a decision not to pay them their full

13   amount.

14            They received, both received sub amounts, plus loans,

15   draws, a daily draw of cash out of my own personal pocket,

16   because they were subcontracted, you know, at-will employees.

17   You know, they're not subcontracted by the government.

18   They're subcontracted by me.  I can terminate their employment

19   at any time, and I told them that.

20            And I said -- you know, they make a lot of money.

21   They get 600 dollars per house.  All they're doing is going in

22   and putting up a couple fire alarms, carbon monoxide detector,

23   the windows, openers for the Miami windows.  It's not a lot of

24   stuff.  The stuff they're putting up doesn't even cost the six

25   hundred dollars, you know.

1          It's abuse, and I called them on it.  And, you know,

2    I contacted my probation officer in May about this, not June,

3    because I did report this.  I reported it to the police

4    department, and they said, man, we really can't do anything

5    unless the people want to press charges, which nobody really

6    wanted to get involved in it.  They just want their stuff

7    fixed.

8          There was an instance where Shawn, his job was to

9    deal with roofs.  He went to a house in Ciales, to people who

10   went four months in one room, and he washed their roof and

11   then he sealed it the same day, right after the other.  The

12   whole house is ruined.  Now you have to sand blast the roof.

13         And the Americans that are in charge of this are

14   telling me, hey, why are you letting this team do this.  You

15   have to hold them accountable. If Matt Vargo (ph) was here

16   from Patriot today, he would say the same thing.

17         There are a lot of instances where people are abusing

18   people.  You know, they didn't have anything.  I didn't grow

19   up with much.  And I'm not going to say I paid them.  I didn't

20   pay them.  The Court is absolutely right.  I did not pay them

21   one penny, nor would I today.

22         And I went to the United States.  I spoke with the

23   CEO in Texas, Matt Vargo, as well as the CEO here, and I told

24   them, don't pay them.  They go up to the house and talk to

25   people.  They went up to the houses apparently months after

1   this happened.  And they don't work anymore, as far as I know.

2   As far as Marie Samora (ph) goes -- you know, they threatened

3   my life.

4         When somebody threatens me, especially a place in

5   Puerto Rico where it can be dangerous, and especially someone

6   from the projects, I'm going to take it serious.  And I

7   contacted Mr. Guillermo Aborna in May.  He wasn't here.  He

8   was in Spain.  So the best thing I could do was I contacted my

9   first agent, Nelson Mendoza.  And I called him at eight

10   o'clock at night and explained the situation.  He said, you

11   need to put it all in writing and send it to Mr. Aborna.

12         I didn't hear from them for days.  It wasn't right

13   away.  This was days I didn't hear from them.  It's not like I

14   sent it on a Friday, you know.  I didn't hear from them in

15   days.  And to be completely honest with the Court, by the time

16   they contacted me, I was already gone.  And it's just the

17   truth.  And I didn't know what to do.

18         I don't know a lot of people on this island, and I

19   just -- I did wrong.  And I understand that.  I would just

20   like the Court's understanding of the situation.

21         And I'm being open about the whole -- the Adrian

22   Torres thing.  I mean, what's right is right.  What's wrong is

23   wrong.  And people don't have much on the island right now.  I

24   mean, I met a lot of people with no roof at all --

25         THE COURT:  That's not the issue.

1           THE DEFENDANT:  I know.  I'm saying I have to take

2    into account everybody, and I don't think somebody deserves to

3    get paid if they're stealing, you know.

4           THE COURT:  I'm not getting involved in that.

5           THE DEFENDANT:  Okay.

6           THE COURT:  You had mechanisms under the law to

7    report a threat.  There were other officers at the probation

8    office if Mr. Aborna was not there.

9           THE DEFENDANT:  And I notified Nelson Mendoza.  I

10   called him four times before he was able to answer.  It was

11   like seven, eight o'clock at night.  You know what I'm saying?

12          THE COURT:  Okay.

13          THE DEFENDANT:  And I spoke with him and explained

14   the situation.

15          THE COURT:  Okay.

16          THE DEFENDANT:  He said, write a letter in detail.

17   Explain everything you just told me.  And I did that.  I

18   believe we might have that here.  I did the best -- I'm just

19   not good with everything sometimes, and especially when

20   somebody's threatening my life.

21          Maria and I, I still talk to her every day.  She came

22   to see me the other day while she was here.  I don't know

23   where the -- I'm not going to speak on Mr. Aborna's version of

24   the events, but I don't believe that's the way it was at all.

25   She didn't pay for my ticket.  I used a buddy pass to go to

1  the United States from a friend of mine from the United

2  States.

3          And she did in fact send me money a couple of times.

4  And I never said that I was going to fly back to Puerto Rico.

5  In fact, Your Honor, I had spoken with my attorney, Laurie

6  Galafino (ph) in New York City, who has multiple times tried

7  to speak with probation.  And -- if he's willing to plead

8  guilty up here, why can't we keep him in New York?  He already

9  has an address here.  He doesn't speak the language.  He's

10 already here.  He wants to stay in the States.  Let's see if

11 we can facilitate that.  And they said, absolutely not.

12         THE COURT:  That your attorney doesn't speak what

13 language?

14         THE DEFENDANT:  That I don't speak Spanish

15 completely.  Spanish.

16         THE COURT:  You can speak in English to the probation

17 officer.

18         THE DEFENDANT:  I'm talking about living in Puerto

19 Rico.  I was already arrested, Your Honor.  I was already at

20 MDC Brooklyn.  So she communicated, if he's trying to relocate

21 here and stay here, let's start this process now when he's

22 here.  And he wasn't trying to hear that.

23         And that wasn't just from him.  I believe he received

24 a couple calls from the U.S. Marshal Service, as well as other

25 agencies.  And, you know, I'm sorry.  I can assure you that if

1    you let me go home, back to the United States, that I'll stay

2    committed to doing the right thing.

3           I got a job 24 hours after I got out when I got to

4    the island, and I didn't even have a place to live at.  And

5    within two weeks, I went from living in the place in Caguas to

6    living in Isle Verde.  And you know, I believe it speaks to a

7    little bit of my -- I don't know what the word is --

8    dedication to try to do what's right.  And more so, Your

9    Honor, I wish for a living -- I live in the United States.

10          I'm a good fisherman.  I have a job waiting for me in

11   Montauk, New York, which is not too far from New York City.  I

12   have an address in New York City.  And here I'm told from the

13   first agent, you know, get ready, go fishing.  Just get all

14   the stuff you need.  And when it changed to the next agent, he

15   told me I wasn't allowed to go outside 15 miles of the state

16   waters.

17          And I'm a commercial fisherman.  I fish on federal

18   permits inside of federal waters.  And that's neither here nor

19   there.  I'm just speaking to the context of what I do for a

20   living and how I provide for -- I have a daughter, you know.

21   I'm not the greatest dad in the world, but I do help.

22          She lives in Texas, not California.  And, you know, I

23   help.  I just don't have a lot of communication just because

24   she's young, and right now it's more important to worry about

25   school than worry about her dad who left when she was six,

1   because I was an immature person.

2            And I'm just trying to get home and see my family.  I

3   have some family.  It's not much, but I don't have anybody

4   here.  And I'd just like to ask Your Honor to at least let me

5   get home and show the Court that I can comply and do

6   everything else that I did.

7            I didn't have any dirty urine samples.  I complied

8   with the mental health evaluation.  I complied with the drug

9   evaluation.  I passed both of those, Your Honor.  Wasn't

10  required to go back to either of those.

11           I would just like, you know, an opportunity to show

12  you my commitment, Your Honor.  Thank you.  I have nothing

13  else to say.

14           THE COURT:  Very well.  I'll hear from the

15  government.

16           MS. GORBEA PADRO:  Your Honor, the government moves

17  for the revocation of defendant's supervised release and that

18  he be sentenced to the maximum statutory term of 24 months.

19  This defendant has clearly shown no respect for the law.  He

20  wants to do things his way or no way at all.  He has

21  demonstrated poor judgment along the way, and his modus

22  operandi has been taking advantage of people and wanting to

23  take advantage of the system.

24           He's unable to follow instructions, Your Honor.  And

25  he's coming before this Court today not to admit his

1    wrongdoings and his failure to comply with his conditions of
2    supervised release, but to give excuses and more excuses.

3        He's saying now before this Court there is a job
4    waiting for him.  Well, he should have done the right thing
5    and he should have complied with the conditions of supervised
6    release.  Yet he's saying that there is a job waiting for him.
7    But he informed the probation officer that he had to be on the
8    move and unable to stay in one place.

9        So we really don't understand what is really going on
10   with this defendant, Your Honor.  If we go back to the
11   beginning, after he was originally charged with sexually
12   assaulting a minor, one of his conditions was that he had to
13   register the place and address of residence whenever he was
14   moving, or his job, address, et cetera.

15       He moved to Puerto Rico, and he did not comply with
16   that first requirement.  Then, back in June of this year, he
17   was -- the defendant reported that he had to relocate because
18   of fear of being attacked by these individuals.  And he
19   reported to the probation officer that he had to be on the
20   move and unable to stay in one place.  And he failed back then
21   to report his address of residence to the probation officer,
22   which was one of his conditions of his supervised release, and
23   one of the conditions under SORNA.

24       On that same day, on June 1st, 2018, he was
25   instructed to report to the Probation Office, but he also

1    failed to do so.  Then, in August of this year, another motion

2    by the probation officer was filed that he once again failed

3    to -- he was instructed to provide the address where he was

4    staying, but he declined to do it.  And he failed to report to

5    the probation officer.

6            So, Your Honor, this is an individual who does not

7    want to comply with the conditions, who does not want to

8    report where he's at, who now he's saying that there's family

9    waiting for him, but then again, he says that he's homeless,

10   that he has no family.

11           So in essence, what the government is seeing is a

12   very unstable individual who does not want to comply with the

13   conditions of his supervised release, and he just wants to be

14   on the run, on the run doing whatever he wants to do, which is

15   making the wrong decisions, the wrong, bad judgments.

16           So Your Honor, this revocation, this revocation

17   should be -- his conditions of supervised release should be

18   revoked, and he should be sentenced to a term of 24 months.

19   That is the government's position.

20           MR. HERNANDEZ GARCIA:  Your Honor, if I may reply

21   briefly?

22           Your Honor, I heard sister counsel make her

23   arguments, and I would argue that everything she just said is

24   in favor of supervision, is in favor of the Probation Office

25   getting deeper into the supervision with Mr. Gorman.

1      It's -- there's no -- there's no controversy that

2  he's homeless.  There's no controversy that he doesn't have a

3  strong family background or support system.  The threats in

4  this case, there is no controversy to the extent that when the

5  Probation Office interviewed the girlfriend, she confirmed

6  that there were two guys asking for money to the extent she

7  felt threatened herself and she filed a complaint.

8      And Your Honor, you heard him.  You heard Mr. Gorman

9  today.  He's remorseful.  He wants to comply.  His re --

10 issues are relocating to the States, and the months that he

11 was on supervision prior to leaving, he did so in a -- he

12 complied basically.  His violations in this case are because

13 of particular circumstances that have been substantiated, Your

14 Honor.  They've been memorialized.  And there's no

15 controversy.  That's the only reason we're here today, Your

16 Honor, because of what he did back in June.

17     However, he stated to you just now, Your Honor, that

18 he's committed to his supervision.  He's committed to working

19 with the Probation Office.  And the only reason he left was

20 because of these particular circumstances, Your Honor, because

21 of this case and these particular circumstances, Your Honor.

22     And we cannot forget Mr. Gorman's background, Your

23 Honor.  A sentence of 24 months just won't -- it will not be

24 justified, Your Honor.  That's all we have to say.

25     MS. GORBEA PADRO:  The government disagrees.  If this

1  defendant would have complied, there wouldn't have been two

2  motions filed by the probation officer notifying violations of

3  his supervised release.

4          THE COURT:  Okay.

5          MR. HERNANDEZ GARCIA:  I don't understand the

6  argument.

7          THE COURT:  One thing is clear here.  The defendant

8  has not complied with the conditions of supervised release as

9  per motion of the probation officer.  He has failed to report

10  as instructed, to remain at the same address.  Regardless, he

11  has failed to follow the procedures that had been explained to

12  him.

13          Even if he needed help or protection, he is well

14  aware as well to -- even to relocate or transfer supervision,

15  there's a process as well.  It's not that the Court can come

16  here and Order from now on he will be supervised in New York.

17  There needs to be a request, and the District of New York

18  needs to accept supervision.

19          It is also clear that this defendant may have mental

20  conditions for which he needs treatment, and he's not

21  receiving it.  But, as well, there's evidence pointing to the

22  fact that he tends to manipulate the system.

23          He has been lucky enough not to be charged with

24  illegal possession of identification documents under two

25  different names, which is separate violations, and had the

1    evidence been presented, would have been conduct that amounts
2    to probably a felony offense, but would have increased the
3    grade violation significantly, having the exposure of this
4    defendant increased as well.
5          I think that listening to the defendant, I have to
6    agree with the government.  He keeps giving excuses.  Though
7    he says sorry, there's always an explanation and a scenario
8    under which he puts and portrays things that have happened.
9    But certainly the violations do stand.  He has failed to
10   register as well, which is a serious violation.
11         Sentencing the defendant to the maximum statutory
12   penalty with no supervised release actually would be to just
13   leave the defendant out there on his own and maybe not
14   providing a good opportunity for rehabilitation.  So I'll just
15   impose -- a sentence that will reflect the seriousness of the
16   offense would be at the higher end of the guidelines, but I
17   will keep this defendant under supervision.
18         I find that he and the community as well are in need
19   of those conditions of supervision, and both will benefit.
20   Defendant by receiving assistance that he needs for his
21   rehabilitation, and the community will be protected from any
22   further harm that could be caused by this defendant.  And the
23   defendant will have to register as required.
24         After having heard the parties in the case, the Court
25   finds that Mr. James Francis Gorman has violated the

1   conditions of supervised release term by failing to comply

2   with the conditions of supervised release that he was -- of

3   the Sex Offender Registry and Notification Act, moving to an

4   unapproved place, failing to notify new address to the

5   probation officer, failing to report as instructed, and

6   leaving the jurisdiction without authorization, and absconding

7   after a warrant for arrest had been issued and awaiting for

8   him to be arrested.

9        Accordingly, then the supervised release term imposed

10   on September the 20th, 2017, is revoked.  To impose sentence,

11   I have considered Chapter Seven policy statements, including

12   revocation of supervised release, and the dispositions under

13   Section 7(B)(1.1)(a)(3).  A grade C violation has been

14   determined.

15        Based on a Criminal History Category of III, and a

16   grade C violation, the Guideline Imprisonment Range is from

17   five to 11 months pursuant to Sentencing Guideline Section

18   7(B)(1.4)(A).  Pursuant to 3583(E)(3), upon revocation of

19   supervised release, the Court may impose a sentence of

20   supervised release for not more than two years since the

21   original case at bar is a class C felony.

22        Mr. Gorman, has shown disregard complying with

23   conditions imposed by the Court and also has failed to adhere

24   to the supervision plan.  The efforts made by the probation

25   officer to assist him in compliance and provide some structure

1   have been fruitless.  And therefore, the Court will consider

2   the factors under Section 3553(a)(1)(2)(B)(C), and the nature

3   and the circumstances and the financial scenario described

4   herein, and the violations in which the defendant has

5   incurred.

6          Considering all of that, the Court concludes that a

7   sentence at the higher end of the guideline range is

8   sufficient but not greater than necessary in this case.  The

9   defendant -- I'm asking counsel to, after the judgment, to

10  explain what this means to the defendant.

11         I will keep him on supervised release for a

12  significant period.  And if you keep violating the conditions

13  of release, the request from the government for two years

14  prison sentence can come any time.

15         So according to the judgment of the Court, Mr. Gorman

16  is hereby committed to the custody of the Bureau of Prisons

17  for 11 months.  Upon release from confinement, he will serve

18  eight years of supervised release under the following

19  conditions.

20         The defendant must comply with the standard

21  conditions that have been adopted by the court.  He shall

22  participate in an approved substance abuse monitoring and/or

23  treatment services program.

24         The defendant shall refrain from unlawful use of

25  controlled substances and submit to a drug test within 15 days

of release.  Thereafter, submit to random drug testing.  No less than three samples during the supervision period, and not to exceed 104 samples per year in accordance with the Drug Aftercare Program Policy of the Probation Office as approved by the Court.

If necessary, treatment will be arranged by the probation officer in consultation with the treatment provider. The defendant is required to contribute to the cost of services rendered in an amount arranged by the probation officer based on ability to pay or availability of third party payment.

Defendant shall not have contact with the victim of the prior sex offense and shall not engage in communication with the victim through mail, letters, telephone, computer, electronic devices, or third parties.  The only exception relies in the incidental contact in normal commercial life.

The defendant shall provide the probation officer access to any financial information upon request, and he shall participate in a mental health treatment program for evaluation and/or treatment services as necessary.  If deemed necessary, the treatment will be arranged by the officer in consultation with the treatment provider; the modality, duration, and intensity of treatment will be based on the risks and needs identified.  The defendant will be required to contribute to the cost of services rendered by means of

1  co-payment based on his ability to pay or the availability of

2  third-party payments.

3        The defendant shall submit to a search of his person,

4  property, house, residence, vehicles, papers, computers, other

5  electronic communication or data storage devices or media to a

6  search at any time, with or without a warrant, by the

7  probation officer, and if necessary, with the assistance of

8  any other law enforcement officer if there is reasonable

9  suspicion of unlawful conduct or a violation of a condition of

10  supervised release.

11        The probation -- the defendant shall warn any other

12  residents within the premises that the property will be

13  subject to search pursuant to this condition.

14        The defendant shall comply with the requirements of

15  the Sex Offender Registry and Notification Act as directed by

16  the probation officer, the Federal Bureau of Prisons, or any

17  state, U.S. Territory or Indian tribe, sex offender

18  registration agency where he resides, works, is a student,

19  carries on a vacation, or is employed, or was convicted of a

20  qualifying offense.

21        The defendant shall undergo a sex offense specific

22  evaluation and/or will participate in a sex offender treatment

23  or mental health treatment program arranged by the probation

24  officer.  And the treatment will be arranged by the probation

25  officer in consultation with the treatment provider; the

1    modality, duration and intensity of treatment will be based on

2    the risks and needs identified by the probation officer and

3    the experts in the field.

4              The defendant shall abide by all rules, requirements

5    and conditions of the sex offender treatment program,

6    including submission to testing, such as polygraph and/or any

7    other testing available at the time of release.

8              Defendant shall waive his right of confidentiality in

9    any records for mental health assessment and treatment

10   services and shall sign any necessary release required to

11   obtain those records that are imposed as a consequence of the

12   judgment that will allow the probation officer to review

13   defendant's course of treatment and progress with the

14   treatment provider.

15             The defendant shall be required to submit to an

16   initial polygraph examination and subsequent maintenance

17   testing intervals to be determined by the Probation Office to

18   assist in treatment planning, in case monitoring and as a

19   means to ensure that he's in compliance with the requirements

20   of his supervision program.

21             So that's the object and scope.  The defendant will

22   be required to contribute to the cost of services rendered

23   based on co-payment based on his ability to pay or third party

24   payment.

25             The defendant has been given notice he has 14 days

1  from entry of judgment in order to appeal from the judgment of

2  conviction and sentence.

3           And Mr. Gorman, let me say this.  I have given you

4  the benefit of a guideline sentence.  And I could have

5  construed reasons to go beyond that and given you a higher

6  sentence.

7           Here you have complained about people who were

8  stealing and not entitled to receive payment from you, but

9  never reported those individuals.  And you know what?  You

10 never paid your landlord.  And you left the place in disarray

11 even, with syringes and all that kind of stuff at the

12 apartment you had and where you were living.

13          So I'm not taking that into consideration, and I have

14 not taken it, but you have to understand that there's a -- the

15 universal law of cause and effect.  The way you behave towards

16 others, others will start to behave.  And contributing -- in

17 the same fashion, you do well and you will receive well.

18          So this time you have received the benefit.  I hope

19 that you adjust and that you will comply with the conditions

20 imposed.  And remember the words of the government here.  Next

21 time around, probably the prosecutor won't be asking for the

22 same type of penalties.  You'll be facing harsher sentences,

23 and God forbid, additional charges for any other conduct.

24          So anything else?

25          MR. HERNANDEZ GARCIA:  Yes, Your Honor.  Briefly, in

1    terms of designation, Your Honor, we would request that

2    Mr. Gorman complete the remainder of his sentence at an

3    institution in the New York City area.  And that while at the

4    institution, he receive mental treatment.  And that the BOP

5    comply with his kosher diet.

6          We request that, those Orders, Your Honor.  Also, and

7    finally, Your Honor, we would request an Order to probation

8    regarding the potential address that we've informed earlier

9    today.

10         THE COURT:  What potential address?

11         MR. HERNANDEZ GARCIA:  There's an address in New York

12   City, with the purpose of seeing -- with the purpose of

13   transfer of supervision, Your Honor.  We provided an address,

14   permanent address, the name of a person who lives at that

15   address.  We gave it to probation about a month ago.

16         We would request an Order that the Probation Office

17   look into that address and this person to the extent that --

18         THE COURT:  Well, let me put it this way, and take it

19   by stages.  The recommendation for designation is granted.  If

20   the Bureau of Prisons can locate him in an area of New York,

21   no problem at all.

22         In terms of instructing the probation officer, that

23   will have to be done, I understand, with whoever works the

24   release plan in New York.  I don't know to what extent

25   probation here will be submitting the collaterals, but there's

1   a process for that.

2   So whatever the process is, I think probation knows

3   defendant's intent, request for transfer of supervision.  I

4   don't know where now he has to place that, whether it's with

5   the case manager at BOP --

6   PROBATION OFFICER:  (Nodding head up and down.)

7   THE COURT:  Okay.  They are telling me yes here, so I

8   suggest you discuss that with the probation officer here after

9   the conclusion of the session, and the defendant be guided,

10  given advice as to how to proceed.

11  MR. HERNANDEZ GARCIA:  I have the same understanding

12  as you in terms of internal procedures, Your Honor.  Probation

13  officer informed me back in September that an Order from Your

14  Honor was required.  That's why I'm making the request.  So --

15  but we will inform Mr. Gorman to --

16  THE COURT:  Let me ask the probation officer, what is

17  it that I have to Order now at this juncture?

18  PROBATION OFFICER:  Well, Your Honor, I think that

19  the attorney was requested in July or -- that we, for -- we

20  could request a relocation at that time, and we told the

21  attorney that we needed first to complete the revocation

22  proceedings and we look into that as part of the relief stage.

23  So he was trying to push us in that direction, but at

24  that time he wanted us to do something with the revocation.

25  But we really had no -- the revocation proceeding was still

1    pending, so we still -- we needed to finalize this in order

2    for us to know what route to go.

3            THE COURT:  So as far as the concern, this is the way

4    I see it.  The defendant now goes to serve his sentence.  At

5    the time he's about to be released, he will be released to the

6    district he was sentenced or where he lives, and then they

7    work the plan.  If supervision is transferred to New York, New

8    York will ask a collateral from the Probation Office here.

9    Then I will have to sign the paperwork.  But the Judge out

10   there has to accept before I sign those papers.

11           So once New York accepts, all they ask is for us to

12   release him.  I have no problem, but the procedures have to be

13   followed.  And the transfer does not materialize simply

14   because I issue an Order.  The supervising district has to

15   accept.  And they can decline.

16           MR. HERNANDEZ GARCIA:  We understand, Your Honor.

17   But given there is an address and the name right now, and

18   given that he --

19           THE COURT:  I cannot Order it.  I cannot Order it,

20   even if there is an address.  He will have to provide that

21   address to the person that is working his release plan at the

22   Bureau of Prisons.  That's what I'm saying.  I cannot Order

23   his relocation.

24           MR. HERNANDEZ GARCIA:  We understand that.  I will

25   make it clear to him, Your Honor.

1          THE COURT:  Okay.

2          MR. HERNANDEZ GARCIA:  Your Honor, in regard to the

3    mental treatment and the kosher diet, did you --

4          THE COURT:  Well, the Bureau of Prisons is supposed

5    to give every defendant the diet that is necessary.  So to the

6    extent he has a special diet, Bureau of Prisons is instructed

7    to provide it to him, as well as the mental health evaluation

8    and treatment if deemed necessary.

9          MR. HERNANDEZ GARCIA:  Nothing further on our part,

10   Your Honor.  Thank you.  Have a good day.

11         THE COURT:  Very well.  Court remains adjourned.

12         (At 2:46 PM, proceedings concluded.)

13                    *     *     *

14

15

16

17

18

19

20

21

22

23

24

25

```
1    U.S. DISTRICT COURT    )

2    DISTRICT OF PUERTO RICO)

3

4         I certify that this transcript consisting of 37 pages is

5    a true and accurate transcription to the best of my ability of

6    the proceedings in this case before the Honorable United

7    States District Court Judge Aida M. Delgado Colon on October

8    31, 2018.

9

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```